**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| DYLAN JAMES GOLDSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| | ) | |
| NATIONAL COLLEGIATE | ) | |
| ATHLETIC | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW Plaintiff, Dylan James Goldstein, ("Dylan") by and through counsel, Cohan & Levy, and files his Verified Complaint for Damages and Injunctive Relief against Defendant, the National Collegiate Athletic Association ("NCAA"), and for his causes of action against the NCAA submits as follows:

### I. NATURE OF THE CASE

1.

What would you do for a chance to play Division 1 sports at the University of Georgia? What would that be worth? How could you value that experience? Whatever the answers to the foregoing questions – that is why we are here.

1

2.

On the other hand, what advantage derives from depriving a college athlete of a year of D-1 competition because she or he played the same sport for a season at a junior college ("JUCO")?  And why is it different if, instead of playing at a junior college, the athlete plays abroad?  No advantage flows from the deprivation. And there is no reason to treat a season abroad different from a season at a JUCO.  In short, there is no reason for a JUCO penalty.  The following paradox illustrates the issue.  A college prep school plays a baseball game against a JUCO.  A player on the JUCO team loses a year of eligibility.  The prep school athletes do not lose a year of eligibility.

3.

Subject only to NCAA approval, the University of Georgia ("UGA") wishes to have Dylan play baseball as a bulldog.  That opportunity is the chance of a lifetime.  The season started on February 14, 2025, and every missed day and every missed game count. UGA can give up on Goldstein at any time for lack of NCAA approval, and his baseball career likely ends in that instant.  This is no different than cutting down the proverbial 200-year-old oak tree.  It cannot be restored. Thus, this matter is an emergency.

Plaintiff Dylan Goldstein seeks immediate injunctive relief to preclude the National Collegiate Athletic Association ("NCAA") from enforcing its Junior

2

College ("JUCO") Eligibility Limitation Bylaws (as defined below) to preclude Dylan from playing in a fourth year of NCAA Division I college baseball on the grounds that such enforcement violates Section 1 of the Sherman Antitrust Act. The JUCO Eligibility Limitation Bylaws unlawfully restrain the market for NCAA Division I college football players by precluding Dylan Goldstein and other similarly situated athletes who enrolled in junior colleges from having an opportunity to earn NIL Compensation while playing four years of NCAA Division I college sports (the "JUCO Penalty"). Specifically, the JUCO Eligibility Limitation Bylaws unreasonably start each athlete's Eligibility Clock while the athlete is attending a non-NCAA institution and is unable to earn NIL Compensation. The JUCO Eligibility Bylaws wrongfully equate competition at the junior college level (where little to no NIL is available) as being reasonably commensurate with the opportunity to earn NIL Compensation while playing NCAA Division I football.

In a landmark 2021 decision (*NCAA v. Alston*, 594 U.S. 69 (2021)), a unanimous U.S. Supreme Court paved the way for college athletes[1] to receive compensation for use of their names, images, and likenesses ("NIL Compensation")

---

[1]    Like the Third Circuit Court of Appeals, this Memorandum avoids using the term "student athlete" because it "is an NCAA marketing invention designed to 'conjure the nobility of amateurism,' assert 'the precedence of scholarship over athletic[s],' and 'obfuscate the nature of the legal relationship at the heart of a growing commercial enterprise.'" *Johnson v. NCAA,* No. 12-1223 (3rd Circuit Jul. 11, 2024).

due to the NCAA's violation of antitrust laws. While courts had previously deferred to anticompetitive NCAA rules to protect "amateurism" in the NCAA, when "market realities change, so may the legal analysis," and "the market realities [of college sports] have changed significantly since 1984." *Alston*, 594 U.S. at 98.

For instance, "[f]rom 1982 to 1984, CBS paid $16 million per year to televise the March Madness Division I men's basketball tournament. In 2016, those annual television rights brought in closer to $1.1 billion." *Id.* at 94. In no unmistaken terms, the *Alston* Court ruled that the NCAA is not entitled to any "sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade." *Id.* at 94.[2]

Reacting to the Supreme Court's ruling in *Alston*, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation on July 1, 2021. In the three years since, the market for NIL Compensation opportunities available to

---

[2]    Prior to *Alston*, courts often deferred to NCAA anticompetitive rules through reliance on previous Supreme Court *dicta* concerning the NCAA's desire to "preserve the amateur character of college athletics." *See NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498 (7th Cir. 2018), *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012). *Alston* overruled those cases, noting, "[g]iven the sensitivity of antitrust analysis to market realities—and how much has changed in this market—we think it would be particularly unwise to treat an aside in *Board of Regents* as more than that. This Court may be 'infallible only because we are final,' but those sorts of stray comments are neither." *Id.* at 93 (internal citations omitted). As Justice Kavanaugh wrote in his concurrence, "the NCAA has long shielded its compensation rules from ordinary antitrust scrutiny... The Court's decision marks an important and overdue course correction." *Id.* at 108 (Kavanaugh, J.,concurring).

NCAA Division I athletes has exploded, with the 2024 college football NIL market estimated at $1.1 billion.[3]  Significantly, those NIL Compensation opportunities are virtually only available to NCAA Division 1 athletes. In fact, **only $6.5 million – less than six tenths of one percent of the $1.1 billion in football NIL Compensation this year projects to go to non-NCAA Division 1 football players**.[4]

In other words, athletes playing football outside of the NCAA monopoly have no meaningful opportunity to profit off their name, image, or likeness. Even so, current NCAA Bylaws 12.8, 12.02.6, and 14.3.3 (collectively, the "JUCO Eligibility Limitation Bylaws") restrict the ability of athletes who begin their college football careers in junior colleges from having the same opportunity to profit from NIL as students who enter an NCAA institution as freshmen.[5]  Specifically, the JUCO Eligibility Bylaws limit athletes who begin their college careers at junior colleges to only two or three seasons of NCAA Division I football, as opposed to the four seasons of competition (and NIL Compensation opportunities) available to all other NCAA Division I football players.

The JUCO Eligibility Limitation Bylaws neither promote competition nor benefit college athletes with respect to their impact on persons who attend junior

---

[3]    *See* Complaint Ex. 1, "NIL at 3: The Annual Opendorse Report" at p. 4.
[4]    Id.
[5]    *See* Complaint Ex. 2, NCAA Division I 2024-25 Manual.

colleges before transferring to NCAA schools. These rules stifle the competition in the labor market for NCAA Division I football players, harming college athletes and degrading the quality of Division I football consumed by the public. These harms are contrary to Defendant's stated mission of promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy. Dylan, and other college athletes who are harmed by this illegal restraint have a small window of time to compete in Division I football. Because Dylan cannot relive his short college career, the harm inflicted by the JUCO Limitations Bylaws are irreparable and ongoing, and temporary and preliminary injunctive relief is necessary.[6]

4.

The NCAA position benefits no one and hurts everyone it impacts, athletes, jucos, NCAA schools, and the public. Dylan has requested NCAA approval to play baseball for UGA. Dylan and multiple representatives, on his behalf, have contacted the NCAA. The NCAA will not take or return calls or other communications. The NCAA has intentionally failed and refused to approve or disapprove the request. They lacked the courage, character, professionalism, or even common courtesy to respond. Under the heading "Mission," the NCAA website proclaims its mission is to: "Provide a world-class athletics and academic experience for student-athletes that

---

[6]    Diego Pavia v. National Collegiate Athletic Association, In the United States District Court for the Middle District of Tennessee at Nashville, Case no. 3:24-cv-01336, Memorandum In Support Of Motion for Temporary Restraining Order and Preliminary Injunction, pp. 1-4 (adapted to this case).

fosters lifelong well-being." Ducking calls, shirking responsibility, and taking harmful, arbitrary, anti-competitive positions is the antithesis of the proclaimed mission.

5.

The NCAA has already fought and lost this fight. In a nearly identical case, The United States District Court for the Middle District of Tennessee has already enjoined NCAA enforcement of the very same Bylaw provisions that are at issue in the instant case. *Pavia v. NCAA*, Case No. 3:24-cv-01336.

6.

Dylan brings this action to enjoin the NCAA from enforcing arbitrary and anti-competitive Bylaw provisions. If the NCAA is permitted to enforce the subject provisions, Dylan will be unable to play baseball for the University of Georgia in the season that commenced on February 14, 2025. The NCAA's enforcement will cause irreparable harm.

7.

Make no mistake. The harm that we are addressing is not limited to money. No legal remedy would ever right this wrong. The opportunities that can flow from a season of division 1 sports go well beyond money. For example, Dylan **will** lose the life changing experience of playing baseball for the University of Georgia ("UGA") in the current season. Dylan **will** lose the opportunity to showcase his

talent, nationally. Dylan may lose the opportunity to play professional baseball. Dylan may lose other baseball-related opportunities including, by way of example only, coaching, commentating, and other career opportunities. Dylan may lose non-baseball corporate opportunities. UGA **will** lose the opportunity to choose talent that can result in commercial and athletic competitive advantage and corresponding massive revenue. The NCAA **will** deprive the public of the opportunity to enjoy UGA baseball at its best. The benefits that flow from a year of division 1 sports, including travel, networking, personal development and more cannot be measured by money, alone.

8.

The balance of equities is nothing short of an avalanche in favor of Dylan. An injunction hurts no one. Denying an injunction or waiting even one day, risks immeasurable damage to Dylan, UGA, and the public. There is no reason to wait.

9.

Only an immediate injunction can protect Dylan from the NCAA. Sadly, that is the reality – the need for protection from the NCAA. The balance of equities is overwhelming. Granting the injunction neither hurts, nor so much as inconveniences anyone. Delaying the injunction, even for a day, could end Dylan's career, decide whether UGA enjoys a championship season or not, diminish marketing revenue, and more. The opportunities described by way of a few examples, above will be

forever gone.  There is no way to recreate this moment in time, and there is no adequate means of valuing the loss.

10.

NCAA enforcement is arbitrary and anti-competitive.  In no way does NCAA enforcement of the subject bylaws foster competition. Specifically, the NCAA bylaws steers athletes from JUCOs to NCAA schools, thus disadvantaging the ability of JUCOs to compete for students and tuition revenue.  NCAA enforcement disadvantages the ability of NCAA schools to compete for athletes, donations, television revenues, and more by depriving the NCAA schools of the ability to recruit, choose, and play the best athletes.  NCAA enforcement obviously harms athletes like Dylan, Pavia[7], Osuna Sanchez[8], and Arbolida[9] by depriving them of the ability to showcase talent, to compete for the chance to play professional sports, and to compete for NIL money. No less important, NCAA enforcement of the subject bylaws deprives the public of the chance to see the very best athletes competing.

---

[7]      Diego Pavia v. National Collegiate Athletic Association, In the United States District Court for the Middle District of Tennessee at Nashville, Case no. 3:24-cv-01336.

[8]      Alberto Osuna Sanchez v. National Collegiate Athletic Association, In the United States District Court For the Eastern District of Tennessee at Knoxville, Case No. 3:25-cv-62.

[9]      Cary Arbolida v. National Collegiate Athletic Association, In the United States District Court for the District of Kansas, Case No. 2:25-cv-02079.

The ultimate tragedy is there is no offsetting encouragement of commercial competition. There is no "other side" to this issue.

11.

NCAA enforcement of the subject Bylaws have a punitive effect on Dylan and violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, among other claims, and would cause substantial and irreparable harm to Dylan.

12.

Plaintiff satisfies all necessary elements for injunctive relief. Trial courts have broad discretion to decide whether to issue an interlocutory injunction. Courts should consider the following: 1)whether there is a substantial threat that the moving party will suffer irreparable injury if the injunction is denied, 2)whether the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; 3)whether there is a substantial likelihood that the moving party will prevail on the merits, and 4) whether the relief, if granted, will disserve the public interest. Here the analysis overwhelmingly demands an injunction. The risk to Dylan if the Court denies the injunction is likely catastrophic. Granting the injunction will not harm or even inconvenience the NCAA or anyone else in the least. Dylan is likely to succeed on the merits. The U.S. Supreme Court decision in *Alston* (*NCAA v. Alston*, 594 U.S. 69 (2021), as well as

the Injunction in the Pavia case[10] leave little doubt as to the likely outcome of this litigation. The public, including jucos, NCAA schools, athletes, advertisers, and audiences deserve the best possible athletic competition, unhindered by the NCAA's arbitrary and capricious interference.

## II. PARTIES AND JURISDICTION

13.

Dylan currently resides in Athens, Georgia, and is enrolled as a student at the University of Georgia ("UGA"). By all accounts, Dylan is a standout collegiate baseball player. In the Spring semesters of 2020 and 2021, Dylan participated in baseball for two (2) JUCO seasons at Chipola College ("Chipola"), located in Marianna, Florida, prior to enrolling at an NCAA Division I institution. Unfortunately, the 2020 college baseball season was canceled based upon the COVID-19 Pandemic. Thereafter, Dylan enrolled as a student at Florida Atlantic University ("FAU") in the Fall of 2021. Dylan subsequently participated in two (2) seasons of Division I baseball at FAU in the Spring semesters of 2022 and 2023. In the Fall semester of 2023, Dylan enrolled at UGA and participated in one (1) season at the University of Georgia ("UGA") in the Spring of 2024. Dylan remains a

---

[10]    A true and correct copy of the Preliminary Injunction Order is attached hereto as Exhibit "1," and a true and correct copy of the referenced Memorandum is attached hereto as Exhibit "2."

member of the UGA baseball team and is seeking to participate in a fourth year of Division I baseball at UGA as a Bulldog.

14.

The NCAA is an unincorporated, member-led organization that acts as the governing body for collegiate athletics. The NCAA is made up of over one thousand two hundred (1,200) member institutions, divided into Division I, Division II, and Division III designations. Three hundred fifty-two (352) of the NCAA member institutions are Division I schools, including UGA.

15.

This Court has jurisdiction over this action pursuant to 15 U.S.C. § 4, 15 U.S.C. § 15, 15 USC § 26, and 28 U.S.C. §§ 1331 and 1337.

16.

This Court may exercise personal jurisdiction over the NCAA because the NCAA currently transacts business in the Northern District of Georgia. The NCAA and its member institutions, including UGA, conduct collegiate sports competitions, ticket and merchandise sales and other revenue-generating activities in the Northern District of Georgia.

17.

Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

### III. FACTUAL BACKGROUND

**A. The NCAA**

18.

The NCAA sets the rules and regulations that member institutions and athletes must follow on and off the field. If a collegiate institution wants to participate in the highest level of collegiate athletics (Division I), it must maintain membership with the NCAA and abide by the  NCAA rules and regulations. If an athlete wants to participate in Division I athletics, the athlete must enroll at an NCAA member institution and comply with the NCAA rules and regulations.  The NCAA regulates and controls Division I athletics through Bylaws published in its Division I Manual ("Bylaws"), a copy of which is attached hereto as Exhibit "3."

19.

The NCAA was created to act in the best interest of athletes. The NCAA's main priority is to coordinate and deliver safe, fair and inclusive competition directly and by member institutions. However, the NCAA profits substantially off the services of its athletes. The NCAA generated nearly $1.3 billion in revenue for 2022-2023 through various media rights and marketing deals tied to its championship athletic events.[11]  The NCAA enjoys no presumption of correctness.

---

[11]    *NCAA generates nearly $1.3 billion in revenue for 2022-2023*, Associated Press (Feb. 1, 2024).

20.

Although the NCAA considers JUCO's to be "collegiate institutions" for purposes of determining an athlete's eligibility, it does not govern or control junior college athletics. Junior college athletics are governed primarily by the National Junior College Athletic Association ("NJCAA"), which has no affiliation with the NCAA. In contrast, athletes who compete in many other situations, including religious, college preparatory schools, and abroad, do not forfeit eligibility. In reality, the subject NCAA bylaws, create, and impose what may accurately be called an anti-competitive 'juco penalty."

## B. Name, Image, and Likeness Compensation

21.

In 2021, the U.S. Supreme Court held in *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021), that the NCAA's rules and restrictions on compensating college athletes are subject to the Sherman Act and affirmed a decision invaliding one of those rules.

22.

Following Alston, the NCAA has permitted college athletes to earn money on the use of their names, images and likenesses ("NIL").

23.

While athletes in all NCAA Divisions are permitted to earn NIL compensation, the reality is that the only meaningful opportunities to compete for NIL money are in Division I athletics. Dylan's first opportunity to earn NIL compensation was while participating in Division I collegiate baseball during Spring semester baseball season of 2022.

24.

Even among Division I athletic teams, NIL compensation can vary greatly. It is estimated that the average NIL spending in Atlantic Coast Conference ("ACC") baseball teams was half that of Southeastern Conference ("SEC") baseball teams, with SEC teams spending an average of $820,000-$920,000 per year.[12]

25.

In addition, as part of a recent NCAA settlement, Division I schools will be allowed to share athletic department revenue with their varsity athletes beginning in the 2025-2026 academic year. Based on NCAA financial reporting, each member of the UGA baseball team is set to earn approximately Twenty Thousand Five Hundred Dollars ($20,500) in revenue sharing.[13]

---

[12]    *College World Series might offer glimpse of future with only SEC and ACC teams in field*, Associated Press (June 11, 2024).
[13]    NCAA Revenue Sharing & NIL Estimates 2025, NCAA Revenue Sharing- Baseball Teams, NCAA; https://nil-ncaa.com/baseball/.

## C. The Labor Market

26.

As the Supreme Court has recognized, the NCAA "controls the market for college athletes." *Alston*, 141 S. Ct. at 2167 (Kavanaugh, J., concurring). In the Division I sports labor market, athletes compete for spots on individual team rosters in their specific sport. The process for obtaining a spot on a Division I athletic team is highly competitive. The NCAA estimates that more than eight million athletes play a high school sport, while only 530,000 of those will compete as NCAA athletes in any Division. According to the NCAA's statistics, less than 2.5% of high school baseball players will compete in Division I collegiate baseball.[14]

27.

Division I institutions compete against each other in recruiting top talent by offering various benefits, such as scholarships, access to top tier training facilities and coaching staffs, medical treatment, opportunities to compete at the highest collegiate level, exposure to scouts and other recruiters, nationwide publicity, and the opportunity to negotiate marketing deals and earn NIL compensation. The NCAA recognizes that JUCO transfers are an important part of the Division I sports labor

---

[14]    *Estimated probability of competing in college athletics*, NCAA (April 1, 2024).

16

market, noting that "every year hundreds of talented JUCO players transfer to NCAA Division I four-year colleges around the country looking to make an impact." [15]

28.

The relevant geographic market is the United States. The NCAA and its Division I member institutions are located and compete nationwide.

29.

There are no alternatives to the NIL opportunities or other resources and benefits Division I athletes receive from participating in Division I athletics. The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. Within this market, the NCAA and its member institutions maintain exclusive market power. The NCAA fully controls and dictates the rules and regulations for participation in Division I athletics, and athletes who wish to participate in Division I athletics have no choice but to comply. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield financial revenue for the member institutions.

---

[15] *College baseball's top 50 impact JUCO transfer hitters*, NCAA (Dec. 4, 2024).

**D. The Five-Year Eligibility Rule.**

30.

Bylaws 12.8 and 12.8.1 state that, "a student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport" and must complete "all seasons of participation in all sports within…five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." Pursuant to Bylaw 12.8.1.1, the five-year eligibility clock begins to run from the date an athlete registers as a full-time student and attends the first day of class at any "collegiate institution," regardless of whether the institution is an NCAA member and regardless of whether or not the athlete participates in any sports.

31.

The NCAA granted a blanket waiver to athletes who competed during Spring 2020 athletic season. The waiver, disregarded the 2020 season of competition due to the COVID-19 Pandemic and allowed a sixth academic year to complete five years of eligibility.[16]

---

[16]    *NCAA Division I COVID-19 Question and Answer Guide* (July 30, 2021); NCAA.

32.

Pursuant to Bylaw 12.8, an athlete could attend a non-member JUCO for one (1) year without playing any sports, but that athlete's eligibility clock for Division I athletics without using a year of eligibility. The forgoing describes the JUCO penalty.

**E. The Intercollegiate Competition Rule.**

33.

Bylaw 12.02.6 states that, "intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution…represents the institution in any contest against outside competition…competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution…or competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition."

34.

Pursuant to Bylaw 12.02.6, intercollegiate competition includes athletic competition at a two-year junior college, even though the competition, resources, benefits and NIL opportunities are materially less compared to those available to Division I athletes, and even though athletes competing in other competitions, such as prep-school competitions, are not charged any Division I eligibility.

19

**F. Definition of Collegiate Institution.**

35.

Bylaw 14.02.4 defines a "collegiate institution" to include an institution of higher education that is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree or that conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree.

36.

Thus, junior colleges fall within the definition of a "collegiate institution" even though they are not NCAA member institutions.

**G. Dylan's Competition in Collegiate Baseball.**

37.

Dylan enrolled at Chipola College, a two-year JUCO, in the Spring of 2020. The baseball season was cancelled due to the COVID-19 Pandemic. Thus, Dylan did not play. The 2020 season did not count against Dylan's eligibility.

38.

Dylan remained enrolled at Chipola the following year and competed on their baseball team during the Spring 2021 baseball season. The 2021 season counted and the NCAA reduced Dylan's eligibility by a year leaving him with only three (3) years of Division I eligibility.

39.

Dylan then enrolled at Florida Atlantic University in the Fall of 2021 and thereafter participated in Division I collegiate baseball during the Spring 2022 and 2023 seasons.  The NCAA reduced Dylan's eligibility by 2 years leaving him with only one (1) year of Division I eligibility, notwithstanding that Dylan only competed for 2 years as a Division I athlete.

40.

Thereafter, Dylan enrolled as a graduate student at the University of Georgia for the Fall 2023 semester. UGA is a member of the Southeastern Conference ("SEC") and a Division I institution for men's baseball. Dylan played just one (1) season of Division 1 collegiate baseball at UGA during the Spring 2024 season. Dylan's performance was exceptional.

41.

While at UGA, a Division I institution, Dylan, for the first time, had the opportunity to earn NIL compensation.  To date, Dylan has only competed for three years as a Division I athlete.  Subject to NCAA approval, UGA has invited Dylan to

21

play in the current season which would be Dylan's fourth season as a Division I

athlete.  The NCAA has withheld the required approval.

**H. The NCAA has already fought and lost this battle.**

42.

In November 2024, Diego Pavia, the starting quarterback for Vanderbilt

University, filed a complaint for injunctive relief in the Middle District of Tennessee,

seeking to enjoin the NCAA from enforcing the same Bylaws at issue in this case.

Just as in this case, the NCAA sought to reduce Pavia's eligibility for the year he

competed in JUCO football, leaving him with only three years of Division I

eligibility instead of four. *Pavia v. NCAA,* No. 3:24-cv-01336, 2024 U.S. Dist.

LEXIS 228736 (M.D. Tenn. Dec. 18, 2024).

43.

On December 18, 2024, the U.S. District Court for the Middle District of

Tennessee issued a preliminary injunction enjoining the NCAA from enforcing

Bylaw 12.02.6 against Pavia, permitting Pavia to compete in a fourth year of

Division I football. The court expressly found **that Pavia was likely to succeed on**

**the merits** of his claim that the NCAA's enforcement of the Bylaws requiring JUCO

years to be counted as NCAA Division I eligibility years violates the Sherman Act,

and that Pavia would suffer immediate and irreparable harm if not granted injunctive

relief.

22

**I. NCAA Issues Blanket Waiver Allowing Athletes with JUCO Years to Compete in 2025-2026 Academic Year.**

44.

Following the *Pavia* decision, the NCAA Division I Board of Directors issued a blanket waiver in December 2024 providing certain former-JUCO athletes with a fourth year of Division I eligibility ("Blanket Waiver"). Specifically, athletes with JUCO years who used their third year of Division I eligibility in 2024-2025 were permitted to compete in a fourth year of Division I sports during the 2025-2026 season. A copy of the Blanket Waiver announcement is attached hereto as Exhibit "4."

45.

Although Pavia and Dylan have identical collegiate eligibility records (one year disregarded for COVID-19, one JUCO year, and three Division I years), the NCAA's Blanket Waiver does not, on its face, extend relief to Dylan. Unlike football, collegiate baseball is played in the Spring. Therefore, Dylan must use his fourth year of Division I eligibility during the Spring 2025 baseball season. Because the NCAA Blanket Waiver extends eligibility only to athletes using their fourth year of Division I eligibility for Fall 2025 or Spring 2026 seasons, Dylan is not expressly covered by the waiver. This arbitrary and anti-competitive distinction harms Dylan and is another example of the NCAA's arbitrary, capricious, anti-competitive, and, therefore, unlawful restrictions on the market for Division I athletics.

23

**J. Dylan's Waiver Request.**

46.

Following the *Pavia* decision and the NCAA's issuance of a Blanket Waiver to similarly situated athletes, Dylan sought guidance and clarification from the NCAA regarding his remaining Division I eligibility. Like Pavia, Dylan had used one year of JUCO eligibility and three years of Division I eligibility. Thus, like Pavia, Dylan should be eligible to compete in Division I athletics for a fourth year.

47.

To that end, members of UGA's Athletics Department and Counsel for Dylan made several attempts to seek clarification on Dylan's eligibility from the NCAA, to no avail.

48.

On January 17, 2025, UGA's Athletics Department and Compliance Officers submitted a Waiver Request on behalf of Dylan with the NCAA, in order to determine his eligibility for a fourth year of Division 1 collegiate baseball participation. (Exhibit "5").  Waiver requests must be submitted by NCAA member institutions and UGA's submission is a clear indication that they are fully supportive of Dylan's request relief.

49.

As of the date of this filing, the NCAA has not responded to UGA's waiver request and therefore Dylan's eligibility.

50.

Considering that Dylan's eligibility situation is identical to that of Pavia, he believed he would be eligible to play a fourth year of Division I collegiate baseball for the Spring 2025 semester and baseball season. There is no reason why the NCAA should single out spring season athletes!

51.

According to NCAA baseball rules, UGA's baseball roster was finalized and submitted by midnight on February 13, 2025.

52.

While Dylan was not included in UGA's baseball roster submission, UGA continues, for now, to hold a roster spot for him, pending the NCAA's decision regarding his waiver request, and/or the Court's intervention.

**K. NCAA Bylaws Violate the Sherman Act.**

53.

The Bylaws enforced by the NCAA are adopted through member institutions and the Division I council and constitute horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I athletes.

25

54.

The Bylaws at issue in this case violate Section 1 of the Sherman Act by restraining the free market for NCAA Division I athletics by precluding Dylan and other similarly situated athletes who enrolled in junior colleges from earning NIL compensation, accessing top tier resources, and gaining valuable exposure at the highest level of competition while playing four (4) years of Division I athletics. The Bylaws restrain certain college athletes who transfer from a JUCO from taking advantage of four (4) years of Division I eligibility, while affording that freedom to other athletes who enroll at Division 1 institutions as freshmen. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college athletes and member institutions.

55.

The Five-Year Rule violates the Sherman Act by starting each athlete's eligibility clock while the athlete is attending a non-NCAA institution where they lack access to the resources and benefits of Division I schools and are effectively unable to earn NIL compensation. The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the JUCO level (where little to no NIL is available) as reasonably commensurate with the opportunities and benefits available while playing NCAA Division I athletics.

56.

26

Without application of these anticompetitive Bylaws, there would be high demand for the services of Dylan and other similarly situated athletes, as demonstrated by the fact that UGA recruited and signed Dylan and continue to hold a roster spot on their baseball team for him.

57.

The Bylaws disproportionately harm JUCO and former JUCO athletes in the Division I athletics market because the eligibility restraints force them to make decisions about whether to attend a JUCO, whether to participate in sports while attending a JUCO, whether to obtain a degree from a junior college institution, or whether to transfer to an NCAA Division I institution.

58.

The Bylaws harm athletes when they are making these decisions because attending a JUCO college reduces the athlete's Division I eligibility. The JUCO penalty is magnified for baseball players because a baseball player who plays at a JUCO is eligible to turn professional after each year. A baseball player who plays for a Division I school is not eligible to turn professional until after year 3. Because of this issue, many baseball players start their collegiate careers at JUCOs. In doing to, they are currently forced to forfeit Division 1 eligibility.

59.

27

If the NCAA is permitted to enforce these anticompetitive Bylaws against Dylan, Dylan will suffer immediate and irreparable harm. The lost opportunity that comes with missing a Division I college baseball season cannot be remedied with monetary damages only. Not only will Dylan's future potential NIL earnings suffer, but he will be denied the intangible benefits of competing in another season at the Division I level, such as a year of developing his game under top tier coaching and training staff, the nationwide exposure of playing SEC baseball and increased draft prospects.

**L. The Rule of Restitution.**

60.

If the Court grants Dylan the injunctive relief to which he is entitled, the Court should also enjoin the application of Bylaw 12.11.4.2, which permits the NCAA to demand "restitution" from UGA in the event the Court's injunctive order prohibiting the enforcement of Bylaw 12.02.6  against Dylan is vacated, stayed, reversed or otherwise determined to be not justified. Under Bylaw 12.11.4.2, restitution can include, but is not limited to, vacating athlete and member institution records, postseason bans, and financial penalties. Granting Dylan injunctive relief, while simultaneously permitting the NCAA to punish and/or retaliate against him and/or UGA for acting in accordance with the Court's order would be inconsistent.

28

## IV. CAUSES OF ACTION

**COUNT I**
**(VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)**

61.

Dylan incorporates the factual allegations above as if fully set forth herein.

62.

The NCAA effectively controls the labor market for Division I athletics and enjoys monopsony power in the market for Division I athletics.

63.

The NCAA's actions as described herein have unreasonably restrained competition in the market for Division I athletics.

64.

The NCAA has entered into unlawful horizontal agreements with its member institutions to restrain competition in the relevant market through adoption and enforcement of the anti-competitive Bylaws cited herein. Specifically, the NCAA has unlawfully restrained the ability of Division I college athletes who transfer to the NCAA from a non-NCAA institution to play Division I athletics for the same number of years offered to other college athletes.

65.

The NCAA's actions are a per se violation of Section I of the Sherman Act. Alternatively, the NCCA's enforcement of the Bylaws at issue constitute an unreasonable restraint of trade that cannot withstand analysis under the rule of reason framework. The rule of reason framework can be conducted with a "quick look" or "twinkling of the eye" in this case. *Alston*, 594 U.S. 69, 81 (citing *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 110 n.39 (1984)).

66.

The market for Division I athletic services, in which each athlete competes for roster spots in their respective sport, is the relevant antitrust market. The transactions between the NCAA and NCAA member institutions and the college athletes in this market are commercial in nature and covered by the Sherman Act.

67.

The NCAA's actions have unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as Division I institutions are prohibited from retaining the services of a JUCO transfer, like Dylan, for the full four years they are permitted to retain the services of other college athletes. This limitation disadvantages JUCO players seeking to transfer to an NCAA Division I institution along with former JUCO players currently playing for an NCAA Division I institution and prevents such players from realizing the benefits

30

of competing in NCAA Division 1 athletics for the same length of time available to all other college players, harming their current and future earning potential.

68

Additionally, the NCAA has arbitrarily and capriciously applied the Bylaws in such a manner as to unreasonably and irreparably harm Dylan by granting certain former JUCO athletes a fourth year of Division I eligibility through its Blanket Waiver while simultaneously denying the same to Dylan without any justifiable reason.

69.

The NCAA's and its member institutions' anticompetitive actions were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

70.

The NCAA Bylaws restricting Dylan's eligibility are not procompetitive, and any benefits they provide are far outweighed by the harm to competition and to the college athletes who are subject to the Bylaws.

71.

Moreover, the Bylaws can be modified to impose less restrictive alternatives to accomplish any procompetitive goals the NCAA may allege. Reasonable and less restrictive alternatives available to the NCAA's current Bylaw enforcement

practices, include, but are not limited to: (1) starting a college athlete's eligibility clock when the athlete enrolls in classes at "an NCAA member institution" rather than a two-year collegiate institution; (2) defining "intercollegiate competition" to include competition as part of "an NCAA member institution" as opposed to as part of a two-year collegiate institution; (3) allowing athletes to compete in five (5) seasons of eligibility during their eligibility clock – an alternative which the NCAA is allegedly already considering.[17]

72.

Additionally, rationale, consistent, unbiased and transparent application of its Bylaws and waivers, but individual and blanket, would allow for a more reasonable and less restrictive alternative to the NCAA's current anticompetitive practices.

73.

As a direct result of the NCAA's unlawful conduct, Dylan has suffered and will continue to suffer antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the NCAA Bylaws.

74.

---

[17]    *NCAA considering allowing five years of eligibility for players in all sports*, CBS Sports.

The NCAA's conduct in seeking to enforce its anticompetitive Bylaws is ongoing and will continue to cause irreparable harm to Dylan unless injunctive relief is granted. This ongoing harm has caused, and continues to cause, direct harm to Dylan by restricting his ability to increase his market worth and earn NIL compensation, limiting his future opportunities to showcase his skills and talent for Major League Baseball personnel, denying him the opportunity to develop his talent while having access to top tier coaching, facilities and resources, denying him the opportunity to play collegiate games at the highest level as a member of an SEC baseball team, and does so as an unreasonable restraint on the labor markets for Division I athletics. Additionally, the time for Dylan to transfer to another institution has expired, so if the NCAA is not enjoined from preventing Dylan from using a fourth year of Division I eligibility, Dylan will have no opportunity to play collegiate baseball, effectively ending his collegiate baseball career.

75.

Dylan respectfully requests a temporary restraining order, preliminary injunction, and permanent injunction enjoining the NCAA from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8 and 12.02.6, as to Dylan, and from enforcing NCAA Bylaw 12.11.4.2 to punish Dylan and/or UGA for actions taken in compliance with any orders from this Court. Dylan also asks the

Court to explicitly rule that he is entitled to play Division I college baseball at UGA

for the Spring 2025 season.

## COUNT II
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS)

76.

Dylan incorporates the factual allegations above as if fully set forth herein.

77.

As an enrolled student at UGA and a member of UGA's baseball team, Dylan

has a business relationship with UGA that would be of pecuniary value to Dylan.

78.

As part of that business relationship, Dylan is entitled and expected to

participate on UGA's baseball team.

79.

The NCAA is aware of this relationship.

80.

Through improper means and with improper motive, the NCAA has tortiously

interfered with this relationship by arbitrarily and capriciously refusing to grant

Dylan a waiver to which he is entitled and by enforcing unlawful anticompetitive

Bylaws that interfere with Dylan's rights in the labor market.

81.

34

As a direct result of the NCAA's conduct, Dylan is being prohibited from competing on UGA's baseball team, which would be of pecuniary value to Dylan

82.

The NCAA's interference with Dylan's relationship with UGA has caused and will continue to cause Dylan to suffer irreparable harm and monetary damages.

83.

Accordingly, Dylan is entitled to injunctive relief and monetary damages.

## COUNT III
## (BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD  FAITH AND FAIR DEALING)

84.

Dylan incorporates the factual allegations above as if fully set forth herein.

85.

Dylan is party to a valid and enforceable agreement with the NCAA. In exchange for being a member of an NCAA Division I sports team, Dylan has no choice but to comply with the NCAA Bylaws and regulations which the NCAA imposes.

86.

The NCAA has breached its contractual obligations to Dylan by seeking to enforce unlawful, anticompetitive Bylaws against Dylan which interferes with his rights in the labor market.

35

87.

The NCAA also has a duty to carry out its contractual obligations in a manner that is fair and reasonable and consistent with the implied obligation of good faith and fair dealing that it owes to Dylan.

88.

By seeking to enforce unlawful, anticompetitive Bylaws against Dylan and by arbitrarily excluding Dylan from a blanket eligibility waiver provided to other similarly situated former JUCO athletes, the NCAA has breached the implied covenant of good faith and fair dealing owed to Dylan.

89.

The NCAA's unlawful conduct has caused and will continue to cause Dylan to suffer irreparable harm and monetary damages.

90.

Accordingly, Dylan is entitled to injunctive relief and monetary damages.

**COUNT IV**
**(BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – THIRD PARTY BENEFICIARY)**

91.

Dylan incorporates the factual allegations above as if fully set forth herein.

36

92.

The NCAA is made up of member institutions and operates through valid and enforceable agreements with its member institutions. Through these agreements, the NCAA agrees to provide member institutions with the opportunity to compete in Division I sports and, in return, the member institutions agree to abide by the rules and regulations adopted, interpreted and enforced by the NCAA.

93.

Division I athletes are the intended third-party beneficiaries of these agreements, as the NCAA publicizes that its priority is to provide "a world-class athletics and academic experience for student-athletes that fosters lifelong well-being" and to "coordinate and deliver safe, fair and inclusive competition directly and by Association members." [18]

94.

Division I athletes were specifically contemplated as third-party beneficiaries of the agreements between the NCAA and its member institutions at the time the agreements were made.

95.

---

[18]    Mission and Priorities, NCAA.

The NCAA has breached its obligations to the third-party beneficiaries by seeking to enforce unlawful, anticompetitive Bylaws which interfere with the rights of athletes and Division I institutions in the labor market.

96.

The NCAA also has a duty to carry out its contractual obligations in a manner that is fair and reasonable and consistent with the implied obligation of good faith and fair dealing.

97.

By seeking to enforce unlawful, anti-competitive Bylaws against athletes and member institutions and by arbitrarily excluding Dylan, a third-party beneficiary, from a blanket eligibility waiver provided to other similarly situated former JUCO athletes, the NCAA has  breached the implied covenant of good faith and fair dealing.

98.

As a third-party beneficiary who has and will continue to suffer irreparable harm and monetary damages as a result of the NCAA's actions, Dylan has standing to bring this claim.

99.

Accordingly, Dylan is entitled to injunctive relief and monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Dylan respectfully prays that this Court:

1.     Adjudge and decree that the NCAA's enforcement of NCAA Bylaws 12.8 and 12.02.6 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.     Enter a temporary restraining order restraining the NCAA from enforcing Bylaws 12.8 and 12.02.6 against Dylan and from enforcing Bylaw 12.11.4.2 against Dylan and/or UGA for actions taken in compliance with any orders from this Court and declaring Dylan eligible to compete in Division I baseball for the Spring 2025 season;

3.     Enter a preliminary injunction enjoining the NCAA from enforcing Bylaws 12.8 and 12.02.6 against Dylan and from enforcing Bylaw 12.11.4.2 against Dylan and/or UGA for actions taken in compliance with any orders from this Court and declaring Dylan eligible to compete in Division I baseball for the Spring 2025 season;

4.     Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining the NCAA from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8 and 12.02.6 as to Dylan, and from enforcing Bylaw 12.11.4.2 against Dylan and/or UGA for actions taken in compliance with any orders from this Court and declaring Dylan eligible to compete in Division I collegiate baseball for the Spring 2025 season;

5.      Award Dylan monetary damages in an amount to be determined at trial;

6.      Award Dylan his costs, including reasonable attorneys' fees, including treble damages, pursuant to 15 U.S.C. § 15;

7.      Dylan demands a jury to hear all claims set forth herein for which he has the right  to demand a jury; and

8.      Award Dylan any other relief that this Court deems just and proper.

Respectfully submitted this 17th day of February, 2025.

/s/ Louis R. Cohan
Louis R. Cohan
Georgia Bar No. 173357
COHAN & LEVY
3340 Peachtree Road, N.E.,
Tower 100, Suite 2570
Atlanta, Georgia 30326
Tel: (404) 891-1770
Email: lcohan@cohanlevy.com

*Attorney for Plaintiff*